NED GUERRA,

                Plaintiff,

v.                                        Case No. 22-cv-1365-pp

JASON BENZEL, *et al.*,

                Defendant.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 30) AND DISMISSING CASE

      Plaintiff Ned Guerra, who is representing himself, filed this civil rights lawsuit while he was incarcerated. Dkt. No. 1. The court screened the complaint under 28 U.S.C. §1915A and allowed the plaintiff to proceed on an Eighth Amendment claim against defendants Jason Benzel and Brian Greff, based on allegations that they knew that the plaintiff had a court-ordered no-contact order against an incarcerated individual at Waupun Correctional Institution, that Greff purposefully had the plaintiff transferred to Waupun after the plaintiff complained to Benzel about Greff's inaction on his separation request and that Benzel failed to reverse the decision after the plaintiff asked for his assistance a day after the transfer. Dkt. No. 5 at 5. The court also allowed the plaintiff to proceed on a retaliation claim against Greff, based on allegations that Greff had the plaintiff transferred to Waupun, contrary to the court's no-contact order, because the plaintiff had complained to the warden about Greff's inaction on the plaintiff's request. Id. at 6. The plaintiff filed an amended complaint. Dkt. No. 11. The court screened the amended complaint and allowed the plaintiff to proceed on the same claims that he had raised in

1

his original complaint—that is, his claims against Greff and Benzel in their individual capacities. Dkt. No. 19 at 6-7.

The defendants have filed a motion for summary judgment. Dkt. No. 30. This order grants the defendants' motion and dismisses this case.

## I. Facts[1]

The plaintiff was incarcerated at the time of the events that gave rise to this lawsuit. Dkt. No. 32 at ¶1. Defendant Jason Benzel is the warden at Dodge Correctional Institution; defendant Brian Greff is the security director there and administers and supervises the security program for Dodge. Id. at ¶¶3, 4.

### A. Intake and Initial Classification at Dodge

Dodge is a maximum-security institution housing approximately 1,700 individuals and serves as an intake, reception and assessment center for male offenders committed to the Division of Adult Institutions (DAI). Id. at ¶5. Dodge is responsible for other centralized functions such as the Central Transportation Unit which serves as the hub for transfers of incarcerated individuals. Id. Before an individual is transferred from Dodge, the Bureau of Offender Classification and Movement (BOCM) holds a classification hearing to determine the best institution for the individual. Id. at ¶6. Upon arrival at a DAI intake facility, the BOCM makes decisions regarding an initial classification for an incarcerated individual's custody, placement and program needs. Id. at ¶7. Defendant Greff is not part of the BOCM. Id.

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c). The plaintiff did not respond to the defendants' proposed findings of fact, so the defendants' facts are undisputed for the purpose of deciding summary judgment. See Civil L.R. 56(b)(4) (E.D. Wis.) (E.D. Wis.).

B.  Request for Separation/Special Placement Needs

It sometimes becomes necessary for incarcerated individuals to be separated from one another by a particular housing unit or institution. Id. at ¶8. The separation of incarcerated individuals is a serious matter because it affects not only the incarcerated individual requesting the separation, but other incarcerated individuals and staff. Id. at ¶9. If every incarcerated individual had special placement needs on even a few incarcerated persons, it would limit where corrections could place individuals and could cripple the system. Id. Conflicts happen among incarcerated persons in prison with such frequency that the corrections system could not possibly separate all of them by institution for all such occurrences. Id.

A special placement need (SPN) is a procedure used to physically separate incarcerated individuals who may have issues with other incarcerated persons, staff or institutions by either housing unit or institution. Id. at ¶10. The SPN is investigated, evaluated and documented as supporting certain needs. Id. An incarcerated person requesting consideration for a SPN must complete an Inmate Request for Separation (Form DOC-1803). Id. at ¶11.

Under DAI policy and procedure, if an Inmate Request for Separation is received, it is assigned to be investigated. Id. at ¶14. At Dodge, a security supervisor reviews the request, conducts the investigation and enters the information in the Wisconsin Integrated Corrections System (WICS) with his or her recommendation. Id. at ¶15. The security director conducts a final review to approve the recommendation. Id.

As warden, Benzel is rarely involved in the investigation or approval of a DOC-1083. Id. at ¶16. At Dodge, security supervisors, such as Captain Bonlender, and the security director typically handle the entire SPN process.

3

Id. If staff determines that an SPN is warranted, the investigating staff member enters the concern into WICS, which is a computer database program that contains information about incarcerated persons and is accessible by staff at different institutions. Id. at ¶17. The different types of SPNs that may be recommended include separation by facility between incarcerated individuals, separation by housing units between persons within a facility and separation from a specific facility. Id.

      C.    <u>Plaintiff's Initial Classification at Dodge as of July 1, 2022</u>

The plaintiff was admitted to the Fond du Lac County Jail on August 19, 2019, where he remained for thirty-four months until he was transferred to the Wisconsin Department of Corrections (DOC). Id. at ¶18. When he was at the jail, there was an altercation between the plaintiff and an incarcerated person named Tony Weaver and a fight broke out. Id. at ¶19. The plaintiff was criminally charged with disorderly conduct and two other misdemeanor charges related to that fight. Id. at ¶20. He was found guilty by a jury, and he received thirty-six months altogether. Id. After the sentencing, he was transferred to Dodge. Id.

There was nothing in the court order entered in the judgment of conviction stating that the plaintiff and Weaver could not be housed in the same DOC institution, only that they were to be kept separate. Id. at ¶21. Weaver is the individual the plaintiff requested a separation from at Dodge. Id. at ¶22.

Gary Kumber is a "Sector Chief" at the BOCM. Id. at ¶23. The BOCM may consider whether there is an SPN under consideration or in place as part of the initial classification process and what placement is appropriate for an incarcerated individual. Id. at ¶23. On June 30, 2022, Kumber emailed

Bonlender to ask if an SPN was being considered for the plaintiff. Id. at ¶24. The question was not directed to defendant Greff, although Greff was one of the individuals copied on the email. Id. Bonlender is the security threat group coordinator for Dodge and he oversees special placement requests. Id. at ¶25. He is responsible for investigating SPN requests and communicates regularly with the BOCM. Id. at ¶26. In his email to Bonlender, Kumber explained that the plaintiff had indicated at his classification hearing that he had submitted paperwork for an SPN related to his request for placement at Green Bay Correctional Institution. Id. at ¶27. The plaintiff also reported that "T.W. [Tony Weaver] from his current offense (20CM371) is at WCI [Waupun Correctional Institution]. [The plaintiff] reported that he submitted a SPN and that placement at WCI would not be a good placement option." Id. In response to Kumber, Bonlender stated: "He has nothing approved and nothing pending." Id. at ¶28. Greff was not copied on the response. Id.

On July 1, 2022, Kumber approved a recommendation for the plaintiff's initial classification and determined that placement be at "any maximum security site." Id. at ¶29.

D. Plaintiff's DOC-1083 Received in the Warden's Office

On July 25, 2022, the warden's office received a letter from the plaintiff to Benzel that said the plaintiff had sent an Inmate Request for Separation (Form DOC-1083) to security at Dodge. Id. at ¶¶30-31. The plaintiff's letter also said that he had been told by his social worker that he was classified to go to "any max" but that he was asking to be separated from Weaver because of a fight that broke out between them at the jail in 2020. Id. at ¶31. The plaintiff also said that a request for separation he sent to Greff on May 25, 2022 had not been acted on. Id. at ¶32. He explained that due to a "keep separate" order

he had with Weaver at the jail, he could not be transferred to Waupun because that was where Weaver was housed. Id. at ¶33. The plaintiff asked why there was no SPN in WICS and stated that he "sent a request form to security." Id.

The only record Dodge has of the May 25, 2022 DOC-1083 regarding the plaintiff is the one attached to the correspondence he wrote to Benzel. Id. at ¶34. While the handwriting at the top of the form shows that it was sent to Greff on May 25, 2022, there is no date stamp showing that it was received on or around that date. Id. at ¶35. Even if a DOC-1083 is addressed to Greff's attention, he would not have reviewed it personally because he does not receive requests directly from the incarcerated individual. Id. at ¶36. He sees SPNs only after they are investigated by other security staff and sent to him for approval. Id. Greff does not recall receiving a DOC-1083 from the plaintiff on or around May 25, 2022. Id. at ¶37.

On July 26, 2022, Bonlender signed the DOC-1083 in the Staff Verification/Appraisal section, ticking the box that the information was verified and explaining that the verification was through court documents. Id. at ¶38. That day, Bonlender entered an SPN Concern in WICS which recommended that "it is justifiable to separate these two inmates by housing units." Id. at ¶39.

Once the SPN concern is entered, WICS generates an email to Greff to inform him there is an SPN ready for his review. Id. at ¶40. At that time, Greff confirms that it has been investigated and gives final approval. Id. On July 28, 2022, Greff approved the recommendation to separate the plaintiff from Weaver by housing units. Id. at ¶41. Because of the limitations in separating incarcerated individuals by institutions, Greff agreed with the recommendation to separate the plaintiff and Weaver by housing unit only. Id. at ¶42. He felt

that this was safe because when incarcerated persons are placed in two separate housing units on two separate sides of the institution—for example, East and West housing units—the chances of them intermingling is highly unlikely due to the different schedules for each housing unit. Id. Benzel reviewed the correspondence on July 29, 2022; by that time, the SPN to separate the plaintiff and Weaver by housing unit already had been approved. Id. at ¶44.

On August 1, 2022, Benzel (or his office) responded to the plaintiff's correspondence received on July 25, 2022 and stated that the SPN had been reviewed, verified and recorded in WICS. Id. at ¶45. The only involvement Benzel had with the plaintiff's SPN was his August 1, 2022 response to the plaintiff's July 25, 2022 correspondence. Id. at ¶46. Benzel did not know before receiving that correspondence that the plaintiff claimed he previously had submitted an SPN. Id. at ¶47.

E. Transfers of Incarcerated Individuals

The BOCM looks at the approved recommendation to determine the appropriate placement of an incarcerated individual. Id. at ¶48. Greff has no control or authority over where an individual is transferred; that is the role of the BOCM's transportation coordinator. Id. at ¶¶48-49. Id. Greff never said anything to the plaintiff about Greff pulling strings or otherwise maneuvering to have the plaintiff sent to Waupun, or told the plaintiff that he was going to Waupun. Id. at ¶51. The lieutenant who allegedly told the plaintiff that he was being transferred to Waupun said nothing about Greff pulling strings. Id. at ¶52. The only part Greff plays in transferring an incarcerated individual to another institution is supervising the staff who carry out the transport. Id. at

7

Case 2:22-cv-01365-PP     Filed 01/15/25     Page 7 of 15     Document 42

¶53. He only oversees the staff who drive the bus, pack/inventory the property, and utilize the restraints. Id.

Benzel has nothing to do with where an incarcerated individual is transferred to. Id. at ¶54. It is his understanding that the BOCM transportation coordinator chooses where an individual gets transferred based on various factors, including the availability of bed space. Id. In certain circumstances where an incarcerated person is being transferred to another institution, Benzel is made aware of the transfer. Id. at ¶55. But that usually is when an individual is being transferred to another institution from the restrictive housing unit at Dodge. Id. Benzel never was provided with notification of where the plaintiff was being transferred because the plaintiff was not transferred from the restrictive housing unit at Dodge, so Benzel could not have known that the plaintiff was being transferred to Waupun from Dodge. Id. at ¶56. While Benzel does have the ability to check when an incarcerated person is scheduled for transfer, it is not a routine part of his job. Id. at ¶57. Because he did not know that there was an issue with the plaintiff's transfer, Benzel had no reason to look up the transfer. Id.

    F.    Retaliation

Greff did not retaliate against the plaintiff for filing a complaint against him and going over his head to the warden. Id. at ¶62. Because incarcerated individuals have the ability to correspond with whomever they chose to contact, he would not have considered the plaintiff writing to Benzel to complain about him as going over his head. Id. Greff did not know the plaintiff had written Benzel in July 2022 about his alleged inaction to the plaintiff's SPN request until sometime after this lawsuit was filed Id. at ¶63.

8

Greff is not notified when an incarcerated individual files a complaint against him unless he is questioned about the incident. Id. at ¶64. Greff does not recall ever being questioned about the incident that is the subject of this lawsuit. Id. Greff could not have retaliated against the plaintiff by sending him to Waupun because Greff does not have authority to transfer incarcerated persons. Id. at ¶65.

G. Plaintiff's Transfer to Waupun

The plaintiff was transferred to Waupun on August 2, 2022 and spent forty-two days there. Id. at ¶67. The plaintiff and Weaver were not housed in the same unit and they did not interact with each other. Id. at ¶¶68-69. The plaintiff saw Weaver at Waupun only one time when the plaintiff was at the recreation cage. Id. at ¶70. There was a fence between them so neither one of them could approach the other. Id. The plaintiff does not think Weaver saw him. Id. at ¶71.

The plaintiff did not have a diagnosis for high blood pressure before May 2022. Id. at ¶73. He was not diagnosed with high blood pressure after May 2022. Id. The plaintiff felt that his "anxiety was up" while he was at Waupun because he was "anticipating of them screwing up" and anticipating Weaver and the plaintiff "coming out at the same time" where he was "going to have defend" himself. Id. at ¶74. Since being released from custody, the plaintiff has not sought any counseling related to mental health concerns or any medical care due to the fact that he and Weaver were both housed at Waupun in August 2022. Id. at ¶75.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. Discussion

The defendants contend that the plaintiff's Eight Amendment claim should be dismissed because he cannot show that he suffered a cognizable harm. Dkt. No. 31 at 13-16. The defendants also contend that the plaintiff

cannot show that he was placed at an objectively serious risk of harm and that the defendants were not deliberately indifferent to a serious risk of harm posed to the plaintiff. Id. at 16-20. The defendants contend that the plaintiff's retaliation claim fails because Greff did not have the plaintiff transferred to Waupun because of the plaintiff's complaint to Benzel. Id. at 20-22. The defendants contend that the plaintiff's claims fail because they did not have responsibility for the particular institution to which the plaintiff was assigned. Id. at 22. Finally, they contend that they are entitled to qualified immunity. Id. at 23-26.

The plaintiff responds that the court should deny the defendants' motion for summary judgment. Dkt. No. 40 at 2. He first asserts that "[t]he fact remains that the plaintiff was worried about his safety, that plaintiff sought out psychiatric counseling with the prison clinical." Id. at 1. He states that while he may not be participating in any treatment now, that does not diminish the stress and fear of being attacked that he felt while being housed in the same prison as Weaver. Id. The plaintiff also states that the potential threat existed because Weaver could have ordered a gang member friend to attack the plaintiff during recreation. Id. He contends that housing him in the same prison as Weaver put him in a potentially dangerous situation, which shows indifference. Id. at 2. The plaintiff says that his blood pressure was elevated while at Waupun. Id. And he asserts that the transfer was retaliatory because the plaintiff filed a complaint with the warden. Id.

      1.    *Eighth Amendment Claim*

The Eighth Amendment requires prison officials to protect incarcerated persons from violence at the hands of other incarcerated persons. See Farmer v. Brennan, 511 U.S. 825, 833-34 (1994). Prison officials who do not protect

one incarcerated individual from another may be found liable under the Eighth Amendment only if two requirements are met: first, the incarcerated individual must have been exposed to a risk of objectively serious harm, and second, the prison official must have had actual knowledge of that risk and responded with deliberate indifference. See LaBrec v. Walker, 948 F.3d 836, 841 (7th Cir. 2020); see also Farmer, 511 U.S. at 837-38.

The plaintiff has not satisfied either the objective or subjective element of an Eighth Amendment claim. On July 1, 2022, Kumber, the BOCM's sector chief, approved the plaintiff for placement at any maximum-security institution. Borlander subsequently entered an SPN concern regarding the plaintiff's request to be separated from Weaver. Borlander recommended that the plaintiff and Weaver be separated by housing unit. Greff approved the recommendation. The plaintiff was transferred to Waupun on August 2, 2022. The plaintiff did not want to transfer to Waupun because he knew Weaver was there. During the forty-two days that the plaintiff was at Waupun, he and Weaver were in separate housing units as required by the SPN. During that time, the plaintiff saw Weaver only one time, during recreation, and a fence separated them; the plaintiff does not believe that Weaver saw him. Even if these conditions amounted to a serious deprivation under the Eighth Amendment, the defendants did not act with deliberate indifference because they did not have a role in the BOCM decision to approve the plaintiff for any maximum institution. And while Greff approved Borlander's recommendation that the plaintiff and Weaver be separated by housing unit (instead of by institution), Green and Benzel had no role in transferring the plaintiff to Waupun.

12

Case 2:22-cv-01365-PP   Filed 01/15/25   Page 12 of 15   Document 42

The plaintiff disagrees with the SPN that was entered because it allowed him to be transferred to the institution where Weaver was incarcerated. But the SPN required that he and Weaver be separated by housing unit, prison staff followed the SPN and the plaintiff and Weaver did not come into contact with each other (except for the plaintiff seeing Weaver one time though a fence). A reasonable jury could not conclude that the defendants acted with deliberate indifference. See Giles v. Tobeck, 895 F.3d 510, 513-14 (7th Cir. 2018). The court will grant the defendants' motion for summary judgment as to the plaintiff's Eighth Amendment claim.

2. *Retaliation Claim*

To establish a *prima facie* case of retaliation in violation of the First Amendment, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action. Whitfield v. Spiller, 76 F.4th 698, 707-08 (7th Cir. 2023) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut the claim, by showing that the alleged deprivation would have occurred regardless of the protected activity. Manuel v. Nalley, 955 F.3d 678, 680 (7th Cir. 2020) (citing Kidwell v. Eisenhauer, 679 F.3d 957, 964 (7th Cir. 2012)). If this is established, the plaintiff must demonstrate the proffered reason is pretextual or dishonest. Id. (citing Kidwell, 679 F.3d at 969).

The plaintiff alleges that Greff had him transferred to Waupun in retaliation for the plaintiff's complaint to Benzel that Greff had not responded to the plaintiff's May 25, 2022 letter and SPN request addressed to Greff. But

13

the undisputed facts establish that Greff had no involvement in the decision to transfer the plaintiff to Waupun. Greff did not know that the plaintiff complained to the warden until after the plaintiff filed this lawsuit. The plaintiff has not established a *prima facie* retaliation claim. The court will grant the defendants' motion for summary judgment as to the retaliation claim.

Because the court has granted the defendants' motion for summary judgment on the merits, it will not analyze the defendants' argument that they are entitled to qualified immunity.

### III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 30.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend the deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he should be aware that the appellate filing fee is $605. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under

Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 15th day of January, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**